Filed 1/19/21  Vang v. Board of Trustees of Cal. State University CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| JIM VANG,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>BOARD OF TRUSTEES OF CALIFORNIA STATE UNIVERSITY et al.,<br><br>Defendants and Respondents. | F078787<br><br>(Super. Ct. No. 17CECG04085)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING**<br>[NO CHANGE IN JUDGMENT] |

**THE COURT:**

It is hereby ordered that the nonpublished opinion filed on December 17, 2020, be modified as follows:

1.      On page 9, the second full paragraph beginning "In accordance with …" is deleted and the following paragraph is inserted in its place.

In accordance with the principles set forth by our Supreme Court, the next step of the analysis of legislative intent is to review the statute's legislative history.  Here, the legislative history for the Donahoe Higher Education Act referred to by Vang in his opposition to the demurrer does not refer to private enforcement of the statute.  For instance, the Legislative findings, declarations and statements of purpose set forth in Government Code sections 3560 and 3561 are general in nature and make no mention of private enforcement.  The references to academic freedom, the free exchange of ideas, and full freedom of inquiry do not address, directly or

indirectly, the subject of private enforcement. Therefore, we conclude the legislative history does not clearly demonstrate a legislative intent to create a private right of action for violations of the Donahoe Higher Education Act. Consequently, Vang has not carried his burden of persuasion on the question of whether the legislative history shows the Legislature intended to create a private right of action. (*San Diegans*, *supra*, 8 Cal.5th at p. 739 [burden of persuasion is allocated to party claim a private right of action].)

2. On page 11, at the end of the first paragraph which begins "The legislative findings", the following is inserted:

The Legislature also intended that the Equity in Higher Education Act be interpreted as consistent with specific federal and state statutes addressing equal opportunity and civil rights, including the Unruh Civil Rights Act. (Ed. Code, § 66252, subd. (g).)

3. On page 26, at the end of the second to last paragraph which begins "Of particular significance", the following is inserted:

The regulation's exception for certain decisions to appoint, hire, fire, promote, suspend or take disciplinary action with a financial sanction against a public official or member of the official's immediate family plainly does not apply to the decision on Vang's EO-1063 complaint because that matter was decided without considering the hiring, firing or other disciplinary actions against an official of the University or a family member of such an official. (Regulation 18702.5, subd. (b)(1).)

4. On page 31, at the end of the first full paragraph beginning "Vang contends the contract", the following is inserted:

Thus, even if Government Code sections 3560 and 3561 were incorporated by operation of law into the alleged contract between Vang and the University, there would be no enforceable contractual right to "full freedom of inquiry" (Gov. Code, § 3560, subd. (c)) or "academic freedom" (Gov. Code, § 3561, subd. (c)).

5. On page 34, the following paragraph is inserted before part IX:

Similarly, the general statements in statutes about "full freedom of inquiry" and "academic freedom" cannot be interpreted as representations by the University that Vang would be allowed to choose his own research topic. (Gov. Code, §§ 3560, subd. (c), 3561, subd. (c).)

2.

6.      On page 35, the following section is added immediately before the Disposition:

C.      Costs on Appeal

The award of costs on appeal is governed by the California Rules of Court.  "Except as provided in this rule, the party prevailing in the Court of Appeal in a civil case other than a juvenile case is entitled to costs on appeal."  (Cal. Rules of Court, rule 8.278(a)(1).)  "The prevailing party is the respondent if the Court of Appeal affirms the judgment without modification."  (Cal. Rules of Court, rule 8.278(a)(2).)  Here, the University qualifies as the prevailing party and, therefore, is entitled to an award of costs on appeal.  Vang's lawsuit was not "brought pursuant to [Government Code] Section 54960 or 54960.1" and, therefore, the standards in Government Code section 54960.5 for the award of costs and reasonable attorney fees to local agencies do not apply.

There is no change in judgment.

Appellant's petition for rehearing filed on December 31, 2020, is hereby denied.


                                                            FRANSON, Acting P.J.
WE CONCUR:


SNAUFFER, J.


DESANTOS, J.

3.

Filed 12/17/20  Vang v. Board of Trustees of Cal. State University CA5 (unmodified opinion)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| JIM VANG,<br><br>   Plaintiff and Appellant,<br><br>   v.<br><br>BOARD OF TRUSTEES OF CALIFORNIA STATE UNIVERSITY et al.,<br><br>   Defendants and Respondents. | F078787<br><br>(Super. Ct. No. 17CECG04085)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Jeffrey Y. Hamilton, Jr., Judge.

Jim Vang, in pro. per., for Plaintiff and Appellant.

Xavier Becerra, Attorney General, Cheryl L. Feiner, Assistant Attorney General, Ismael A. Castro and Lisa A. Tillman, Deputy Attorneys General, for Defendants and Respondents.

-ooOoo-

Appellant is a self-represented graduate student who sued a state university and various university officials after his proposed master's thesis project in the field of impact geology was rejected and he was told to work on a new thesis project within the expertise

of one or more faculty members at the university.[1]  When appellant refused to change his thesis topic, the university disqualified him from its graduate program.  Appellant's complaint alleged the defendants violated his right to full freedom of inquiry, violated various statutes prohibiting discrimination and conflicts of interest, breached an implied contract, and committed fraud and intentional deceit.  The defendants filed a demurrer, which the trial court sustained without leave to amend.

Appellant contends university officials discriminated against him by not providing educational services because he is, and associates himself with, impact geologists and because he is not perceived to be an outstanding student.  As explained in detail below, we conclude the various statutes cited by appellant do not prohibit these types of actions against a graduate student.  Appellant also contends defendants violated his right to full freedom of inquiry that is protected by state law and the California Constitution.  We conclude the right to full freedom of inquiry does not include the right to choose one's own thesis research topic.  Also, appellant's allegations were insufficient to state a cause of action for breach of contract or fraud.  Consequently, the trial court properly sustained the demurrer.

We therefore affirm the judgment.

## FACTS

*Parties*

Plaintiff Jim Vang is a Hmong-American born and raised in Fresno.  He works in Fresno, is a taxpayer, and paid all the expenses of his graduate education without assistance from any outside source.

The defendants in this action are (1) the board of trustees of California State University; (2) the president of California State University, Fresno (University), Joseph I.

---

[1]  "Impact geology" has been defined as a branch of geology that deals with the role of large meteor impacts in earth science.  (Kelly and Dachille, *Target Earth* (1953).)

2.

Castro, Ph.D.; (3) the vice provost, Dennis Nef, Ph.D.; (4) the dean of research and graduate studies, James E. Marshall, Ph.D.; (5) the graduate coordinator of the Earth and Environmental Science Department (EES Department), Christopher J. Pluhar, Ph.D.; (6) the chair of the EES Department, Peter Van De Water, Ph.D.; (7) Keith Putirka, Ph.D., a senior faculty member of the EES Department; and (8) John Wakabayashi, Ph.D., a senior faculty member of the EES Department.

*Vang's Participation in Graduate Program*

In the fall of 2007, plaintiff Jim Vang entered the graduate program of the EES Department. Vang took on a thesis project developed by his advisor at the time, defendant Putirka. Vang lost the thesis project to another graduate student because his advisor believed he had not shown much progress and there were too many graduate students in comparison to the number of available thesis research projects.

To avoid having another project taken away from him, Vang developed his own master's thesis project involving the study of meteor impact craters. Vang began working on this thesis research topic in October 2012. Vang went into the field in the southern Sierra Nevada Mountains, collected rock samples and analyzed the samples with various scientific tools. Vang alleges these analyses indicated that a crater in the mountains may have been caused by a meteor impact. Vang believes he may have made the first discovery of a meteor impact crater in California.

To complete the graduate program, Vang needed to find an advisor and form a graduate committee. He asked every professor in the EES Department and all of them turned him down because meteor impact geology was not their interest or because of the high number of graduate students. Vang decided to attempt to obtain an advisor after other students graduated, thinking a spot might become open.

In 2014, Putirka agreed to become Vang's advisor. When Vang presented Putirka with the findings of his thesis research, Putirka told Vang he could no longer act as Vang's advisor.

3.

In January 2016, the EES Department requested its graduate students to prepare a progress report presentation on their thesis research. On February 8, 2016, Vang presented a progress talk on his thesis research. Three weeks later, the EES Department e-mailed Vang its response, which identified seven deficiencies and three required actions. The EES Department asked Vang (1) for a new thesis proposal within the area of expertise of one of their faculty, (2) to find an advisor willing to work with him, and (3) for a presentation of his new thesis proposal towards the end of the semester. Vang refused.

In May 2016, Vang presented his thesis to the faculty of the EES Department again. The faculty collaborated and finalized a disapproval. Defendant Pluhar, the graduate coordinator, wrote a formal letter recommending Vang's disqualification from the EES Department. In early July 2016, Vang received the disqualification letter.

*Administrative Proceedings*

On August 12, 2016, Vang submitted a complaint to the University's administration in accordance with Executive Order 1063 (EO-1063). EO-1063 establishes a complaint procedure for the University's students to allege that the University has violated one or more state laws.

On December 14, 2016, Nef sent Vang a written response to the complaint. The final paragraph of the response stated: "While you are commended for taking the initiative to find a problem of interest to you personally, you were informed a number of times that in order to complete a degree, you would need to have an advisor and no faculty member in the department had the requisite expertise to competently mentor in the project area. It appears you were also informed a number of times that your proposed work was not sufficient for a Master's degree project. Rather than restricting academic freedom or freedom of speech, these are both issues of upholding academic integrity—a key role faculty must play. I do not believe the allegations are substantiated."

In May 2017, Vang submitted a 43-page claim to the University in accordance with the claim presentation requirements of the Government Claims Act (Gov. Code, § 810 et seq.). The claim was rejected in a letter dated June 13, 2017.

## PROCEEDINGS

In December 2017, Vang filed a complaint against the University and six members of its administration or faculty. The operative pleading in this appeal is Vang's 76-page second amended complaint (SAC), containing seven causes of action, which he filed in June 2018.

Defendants responded to the SAC by filing a demurrer asserting the SAC failed to allege facts sufficient to state a cause of action and was uncertain. The trial court issued a tentative ruling to sustain the demurrer without leave to amend. After hearing argument, the trial court adopted its tentative ruling and sustained the demurrer to each cause of action without leave to amend.

In December 2018, the trial court filed a judgment dismissing the action. Vang timely appealed.

## DISCUSSION

I. STANDARD OF REVIEW FOR GENERAL DEMURRERS

A complaint must contain "[a] statement of the facts constituting the cause of action, in ordinary and concise language." (Code Civ. Proc., § 425.10, subd. (a)(1).) The facts needed to properly plead a cause of action are referred to as the essential elements of the cause of action. The essential elements are determined by the substantive law that defines the cause of action. (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2020) ¶ 6:121, p. 6-36.) The facts constituting these elements are the facts upon which liability depends. (*Id*. ¶ 6:123, p. 6-38.)

When a complaint "does not state facts sufficient to constitute a cause of action," a defendant may raise that objection by filing a demurrer. (Code Civ. Proc., § 430.10,

subd. (e).)  Determining whether a pleading alleges facts sufficient to constitute a cause of action is a question of law.  (*Neilson v. City of California City* (2005) 133 Cal.App.4th 1296, 1305.)

Appellate courts independently review an order sustaining a general demurrer and make a de novo determination of whether the pleading "alleges facts sufficient to state a cause of action under any legal theory."  (*McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 415.)  Generally, appellate courts "give the complaint a reasonable interpretation, reading it as a whole and its parts in their context."  (*City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 865.)  The demurrer is treated as admitting all material facts properly pleaded, but does not admit the truth of contentions, deductions or conclusions of law.  (*Ibid*.)

In accordance with the foregoing principles, the pleader's contentions or conclusions of law are not controlling because appellate courts must independently decide questions of law without deference to the legal conclusions of the pleader or the trial court.  (*Villery v. Department of Corrections & Rehabilitation* (2016) 246 Cal.App.4th 407, 413.)  Legal conclusions include (1) the interpretation of a statute and (2) the application of a statutory provision to facts stated in the pleading and assumed to be true for purposes of the demurrer.  (*Ibid*.)  To illustrate the application of the foregoing principles, a statement in a complaint that Defendant X arbitrarily discriminated against Plaintiff Y in violation of the Unruh Civil Rights Act, Civil Code section 51 (Unruh Act) is a legal conclusion and is not accepted as true.  (See Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial, *supra*, ¶¶ 6:124–6:125, pp. 6-38 to 6-39.)

II.     DONAHOE HIGHER EDUCATION ACT

A.     <u>Overview of Statute</u>

Vang's first cause of action asserts a violation of the Donahoe Higher Education Act, Education Code section 66000 et seq.  The act codifies numerous provisions

regarding the responsibilities for higher education in this state provided by California State University and other colleges and universities. (Legis. Counsel's Dig., Assem. Bill No. 617 (1991-1992 Reg. Sess.) 4 Stats. 1991, Summary Dig., p. 490.)

In 1991, the Legislature added Education Code sections 66002 and 66003 to the Donahoe Higher Education Act to set forth its findings and declarations of intent. (Stats. 1991, ch. 1198, § 1.) In 2010, the Legislature updated its findings and declarations. (Stats. 2010, ch. 201, §§ 1, 2.) Section 66003 states the Legislature enacted the Donahoe Higher Education Act "to outline in statute the broad policy and programmatic goals of the master plan and clear, concise statewide goals and outcomes for effective implementation of the master plan, attuned to the public interest of the people and State of California, and to expect the system as a whole and the higher education segments to be accountable for attaining those goals. However, consistent with the spirit of the original master plan and the subsequent updates, *it is the intent of the Legislature that the governing boards be given ample discretion in implementing policies and programs necessary to attain those goals*." (Italics added.)

B. Private Right of Action—General Principles

In *Lu v. Hawaiian Gardens Casino, Inc.* (2010) 50 Cal.4th 592, the California Supreme Court summarized the basic principle used by courts in determining whether a statute authorizes private individuals or entities to bring a lawsuit based on alleged violations of the statute.

> "A violation of a state statute does not necessarily give rise to a private cause of action. [Citation.] Instead, whether a party has a right to sue depends on whether the Legislature has 'manifested an intent to create such a private cause of action' under the statute. (*Moradi–Shalal v. Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 305 [250 Cal.Rptr. 116, 758 P.2d 58] (*Moradi–Shalal*) [no legislative intent that Ins. Code, §§ 790.03 & 790.09 create private cause of action against insurer for bad faith refusal to settle claim]; *Crusader Ins. Co. v. Scottsdale Ins. Co.* (1997) 54 Cal.App.4th 121, 131, 135 [62 Cal.Rptr.2d 620] (*Crusader*) [no legislative intent that Ins. Code, § 1763 gave admitted insurers private right to sue

7.

surplus line brokers].)  Such legislative intent, if any, is revealed through the language of the statute and its legislative history.  (See *Moradi–Shalal*, *supra*, 46 Cal.3d at pp. 294–295.)

"A statute may contain ' "clear, understandable, unmistakable terms," ' which strongly and directly indicate that the Legislature intended to create a private cause of action.  (*Moradi–Shalal*, *supra*, 46 Cal.3d at p. 295.)  For instance, the statute may expressly state that a person has or is liable for a cause of action for a particular violation. (See, e.g., Civ. Code, § 51.9 ['A person is liable in a cause of action for sexual harassment' when a plaintiff proves certain elements]; Health & Saf. Code, § 1285, subd. (c) ['Any person who is detained in a health facility solely for the nonpayment of a bill has a cause of action against the health facility for the detention ….'].)  Or, more commonly, a statute may refer to a remedy or means of enforcing its substantive provisions, i.e., by way of an action.  (See, e.g., § 218 ['Nothing in this article shall limit the right of any wage claimant to sue directly or through an assignee for any wages or penalty due him under this article']; Bus. & Prof. Code, § 17070 ['Any person ... may bring an action to enjoin and restrain any violation of this chapter and, in addition thereto, for the recovery of damages.']; *id*., § 6175.4, subd. (a) ['A client who suffers any damage as the result of a violation of this article by any lawyer may bring an action against that person to recover or obtain one or more of the following remedies.']; Civ. Code, § 1748.7, subd. (d) ['Any person injured by a violation of this section may bring an action for the recovery of damages, equitable relief, and reasonable attorney's fees and costs.']; see *Crusader*, *supra*, 54 Cal.App.4th at p. 136 [listing other statutes expressly creating cause of action].)  If, however, a statute does not contain such obvious language, resort to its legislative history is next in order.  (*Moradi–Shalal*, *supra*, 46 Cal.3d at pp. 300–301; see *Crusader*, *supra*, 54 Cal.App.4th at pp. 133–134, 136 [relying on principles of general statutory interpretation].)"  (*Lu v. Hawaiian Gardens Casino, Inc.*, *supra*, 50 Cal.4th at pp. 596–597, fn. omitted.)

More recently, the Supreme Court confirmed the foregoing principles in *San Diegans for Open Government v. Public Facilities Financing Authority of City of San Diego* (2019) 8 Cal.5th 733 (*San Diegans*).)  First, whether a statute gives rise to a private right of action is a question of legislative intent.  (*Id*. at p. 739.)  Second, the Legislature's intent may be express or implied.  (*Ibid*.)  Third, the Legislature's manifestation of its intent to create a private cause of action under the statute must be

clear. (*Ibid*.) Fourth—and importantly for the present appeal—the burden of persuasion is with the party claiming a right to sue under the statute. (*Ibid*.)

C. Application of Principles

1. *Statutory Language*

The provisions of the Donahoe Higher Education Act cited by Vang in his complaint and appellate briefing (1) do not directly state there is a cause of action for any violation, (2) do not expressly state that an institution or any official is liable for a violation of the statute, and (3) do not refer to any student remedy or means of enforcing the substantive provisions of the Donahoe Higher Education Act. (See Ed. Code, §§ 66002, subd. (f)(1), 66003, 66010.2, 66010.4, 66010.5, 66010.9, 66010.91 & 66030.) Therefore, we conclude the statutory language does not *clearly* demonstrate a legislative intent to create a private right of action. (*San Diegans*, *supra*, 8 Cal.5th at p. 739.)

2. *Legislative History*

In accordance with the principles set forth by our Supreme Court, the next step of the analysis of legislative intent is to review the statute's legislative history. Here, the legislative history for the Donahoe Higher Education Act referred to by Vang in his opposition to the demurrer does not refer to private enforcement of the statute. Therefore, we conclude it does not clearly demonstrate a legislative intent to create a private right of action for violations of the Donahoe Higher Education Act. Consequently, Vang has not carried his burden of persuasion on the question of whether the legislative history shows the Legislature intended to create a private right of action. (*San Diegans*, *supra*, 8 Cal.5th at p. 739 [burden of persuasion is allocated to party claim a private right of action].)

3. *Precedent Established by Case Law*

Published decisions of California's appellate courts provide the last source of law we consider in determining whether the Donahoe Higher Education Act authorizes a

9.

private right of action. Vang has not cited, and we have not located, any decision addressing this issue, much less deciding the statute creates a private right of action. Thus, judicial decisions do not assist Vang in carrying his burden of persuasion.

In summary, the language in the statute, the legislative history, and the lack of precedent holding a private right of action exists supports our statutory interpretation that the Donahoe Higher Education Act does not authorize students to pursue a cause of action alleging violations of the act's substantive provisions. Furthermore, the general principle that *pleadings* are to be liberally construed when challenged by a demurrer does not mean a *statute* referenced in the pleading must be liberally construed. (See Code Civ. Proc., § 452.) Rather, the statute must be construed in accordance with the principles established by our Supreme Court and those principles lead to the conclusion that the Legislature did not intend to create a private right of action. Consequently, the trial court properly sustained the demurrer to Vang's first cause of action.[2]

III.    EQUITY IN HIGHER EDUCATION ACT

A.    Overview of Statute

The second cause of action asserts a violation of The Equity in Higher Education Act as set forth in chapter 4.5 of the Donahoe Higher Education Act and consists of Education Code sections 66250 through 66292.4. The legislative policy underlying the Equity in Higher Education Act is "to afford all persons … equal rights and opportunities in the postsecondary educational institutions of the state. The purpose of this chapter is to prohibit acts that are contrary to public policy and to provide remedies for the commission of those prohibited acts." (Ed. Code, § 66251.) This protection is provided "regardless of disability, gender, gender identity, gender expression, nationality, race or

---

[2]    Based on this conclusion, we need not discuss why Vang's allegations are insufficient to state a violation of the Donahoe Higher Education Act.

10.

ethnicity, religion, sexual orientation, or any other basis that is contained in the prohibition of hate crimes …, including immigration status." (Ed. Code, § 66251.)

The legislative findings and statements of intent for the Equity in Higher Education Act are set forth in Education Code section 66252, subdivisions (a) through (g). The Legislature found that "[a]ll students have the right to participate fully in the educational process, free from discrimination and harassment" and universities "have an affirmative obligation to combat racism, sexism, and other forms of bias, and a responsibility to provide equal educational opportunity." (Ed. Code, § 66252, subds. (a), (b).) The Legislature also determined "[t]here is an urgent need to teach and inform students in the public schools about their rights, as guaranteed by the federal and state constitutions, in order to increase students' awareness and understanding of their rights and the rights of others, with the intention of promoting tolerance and sensitivity in postsecondary educational institutions and in society as a means of responding to potential harassment and hate violence." (Ed. Code, § 66252, subd. (e).) Furthermore, the Legislature intended "that each postsecondary educational institution undertake educational activities to counter discriminatory incidents on school grounds and, within constitutional bounds, to minimize and eliminate a hostile environment on school grounds that impairs the access of students to equal educational opportunity." (Ed. Code, § 66252, subd. (f).)

Article 5 of the Equity in Higher Education Act addresses compliance and enforcement. (See Ed. Code, §§ 66290–66292.4.) The last section of that article states the Equity in Higher Education Act "may be enforced through a civil action." (Ed. Code, § 66292.4.) Part II.B. of this opinion set forth the general principles used by courts to determine whether legislation creates a private right of action. Applying those principles to Education Code section 66292.4, we conclude the Legislature clearly demonstrated an intent to create a private right of action "to provide remedies for the commission of … *prohibited acts*." (Ed. Code, § 66251, italics added.)

11.

The next step of our analysis considers the "prohibited acts" identified by the statute. The substantive provision of the Equity in Higher Education Act that prohibits certain kinds of discrimination is Education Code section 66270, which provides:

> "No person shall be subjected to discrimination on the basis of disability, gender, gender identity, gender expression, nationality, race or ethnicity, religion, sexual orientation, or any characteristic listed or defined in Section 11135 of the Government Code or any other characteristic that is contained in the prohibition of hate crimes set forth in subdivision (a) of Section 422.6 of the Penal Code, including immigration status, in any program or activity conducted by any postsecondary educational institution that receives, or benefits from, state financial assistance or enrolls students who receive state student financial aid."

Our interpretation of this provision necessarily requires us to determine the meaning of the word "discrimination" because the definitions set forth in the Equity in Higher Education Act do not include the term "discrimination." (See Ed. Code, §§ 66260–66264.) "In the absence of a statutory definition, we turn to the ordinary meaning of the words. Black's Law Dictionary (9th ed. 2009) defines 'discrimination' as '[d]ifferential treatment; esp., a failure to treat all persons equally when no reasonable distinction can be found between those favored and those not favored.' (*Id*. at p. 534.)" (*Wallace v. County of Stanislaus* (2016) 245 Cal.App.4th 109, 125–126.) Thus, the discrimination prohibited by the Equity in Higher Education Act encompasses disparate treatment—that is, treating a protected person, such as a university student, differently because of a factor listed in Education Code section 66270. (See *Wallace*, *supra*, at p. 126; see also, *Clark v. Claremont University Center* (1992) 6 Cal.App.4th 639, 658, fn. 3, [in the employment context, disparate treatment occurs when an " ' "employer simply treats some people less favorably than others because of their race, color, religion, sex or national origin" ' "].)

12.

B.      Vang's Allegations

Vang's second cause of action attempted to state a violation of the Equity in Higher Education Act by setting forth the assertions[3] described in the following five paragraphs.

The University must pursue excellence in teaching, research, and learning through the free exchange of ideas among faculty, students, and staff and must respect and endeavor to preserve academic freedom.  Vang's removal from the graduate program was unwarranted because, even if defendants disagreed with his thesis, defendants must (1) provide an environment in which research and professional activity are valued and supported, (2) allow free and open scholarly inquiry for the exploration and appreciation of diverse ideas and viewpoints, and (3) be responsive to the needs of California's citizens and show respect for and due consideration of the role and contributions that each member of the university community, including students, makes to the mission of the university.  The University, through its special majors program, accommodates students interested in a field or degree not offered by the university.  In light of the accommodations made in the special majors program, the University should have been able to accommodate Vang and his interest in an academic field of impact geology, which is a legitimate field of an existing department at the University—namely, its EES Department.  Nonetheless, defendants did not accommodate Vang.

A webpage maintained by the University described the admission process to its geology graduate program.  The webpage stated the applicant should contact a potential advisor before submitting an application and "let them know you are interested in the work they do and would like to enter the grad program with them as your advisor.  Find

---

[3]      Here, we use the term "assertions" in a broad sense to include allegations of fact, contentions of law, and conclusions of law.  (See *City of Dinuba v. County of Tulare*, *supra*, 41 Cal.4th at p. 865.)  Under the principles that govern the interpretation of a pleading, we do not accept contentions of law and conclusions of law as true.  (*Ibid*.)

out if your interests are a good match for that advisor, and find out if they have space in their research group to admit you." The webpage also stated: "The faculty select students who will be admitted based on academic qualifications, available resources, and the match between potential students and advisors. If you already established communication with a potential advisor about working with them, you are more likely to be accepted." Vang interprets these statements to mean that if he "does not fit into their social group, he is not accepted and welcomed in a public education institution that receives state funds."

Defendants openly identified and acknowledged that Vang associates himself with impact geologists, which Vang refers to as a "distinction group," and openly stated they would not provide public service to him because he associates himself with impact geologists. Defendants disqualified Vang from the graduate program because he associates with impact geologists. If defendants had followed their statutory duty and provided educational equity, Vang would not have been disqualified from the graduate program based on his association with impact geologists.

Defendant Pluhar, the EES Department's graduate coordinator, had a duty to provide educational equity for all students and the opportunity for them to address issues that are central to their full development as responsible citizens. Contrary to this duty, Pluhar openly distinguished between students he regarded as outstanding and those he considered not outstanding and provided certain public services and accommodations only to students within the favored group—that is, students perceived to be outstanding. For instance, Pluhar's January 21, 2016 e-mail to Vang stated: "You ask for advisement, which I cannot provide, but I can offer advice: do not go it alone and then try to get an advisor on board afterwards. That only works for the truly outstanding students. The rest of people find an advisor in their general area of interest, and then accept direction."

Pluhar's statements were contrary to educational equity at a public educational institution and imply that public services are available only for outstanding students.

14.

Pluhar's statements demonstrate he did not consider Vang an outstanding student and that he denied public services to Vang based on this perception. This refusal of public services hindered Vang's progress through the graduate program and Pluhar then used the lack of progress to remove Vang from the graduate program. Pluhar's acts and omissions breached his statutory duties. A reasonably foreseeable result from these breaches was an injury to Vang that caused damages. This injury to Vang and the resulting damages were the type the Equity in Higher Education Act was specifically designed to prevent.

C. Analysis of the Sufficiency of Vang's Allegations

1. *Vang's Contentions*

On appeal, Vang interprets the Equity in Higher Education Act as "preventing discrimination and harassment by providing equal rights, opportunities, and full participation in the educational process." Vang asserts his second cause of action— specifically, paragraph 81 of the SAC—"is in regards to a mandatory duty to provide the full and equal services …, not a 'mandatory duty with regard to matriculation of master's degree students in a particular research topic' as incorrectly interpreted by the superior court." Restating his view of the statutory duties, Vang argues defendants "have a mandatory duty to provide him the full, equal rights, services, and opportunities at [the University]" and he "suffered discrimination (arbitrary), since he is and associates himself with impact geologist[s]."

The trial court's order stated Vang "does not allege—or intend to allege—any ethnicity-based discrimination, or any other type of discrimination within the obvious ambit of the [Equity in Higher Education] Act." Vang's disagreement with the trial court's statement is, in effect, an argument that the trial court erred by interpreting the statute too narrowly. Vang supports his view by quoting Education Code sections 66251 and 66252, which contain the Legislature's statement of purpose and its findings and declaration of intent. In his view, his "right to participate fully in the educational process,

15.

free from discrimination" (Ed. Code, § 66252, subd. (a)) means he is protected from *any* arbitrary discrimination. Vang summarizes his second cause of action under the Equity in Higher Education Act by asserting he associates himself with impact geologists and was injured when defendants "discriminated against him by violating his access to the full, equal rights, services, and opportunities at [the University] due to exercising his full freedom of inquiry."

> 2. *Equity in Higher Education Act's Scope*

Vang's contentions raise a fundamental question about the scope of the Equity in Higher Education Act. Specifically, does the statute prohibit "arbitrary" discrimination, as Vang contends, or does it only prohibit discrimination based on the factors listed in Education Code section 66270? We adopt the latter interpretation.

First, the scope of the statute is not defined exclusively by the Legislature's statement of purpose and its findings and declaration of intent in Education Code sections 66251 and 66252. Instead, the Legislature's statements of purpose and intent are useful in interpreting the substantive provisions of the act, but are not substantive provisions themselves. For instance, Education Code section 66251 states the Equity in Higher Education Act's purpose "is *to prohibit acts* that are contrary to that policy and *to provide remedies* for the commission of *those prohibited acts*." (Italics added.) This language demonstrates the act is designed to perform two functions—first it prohibits acts and, second, it provides remedies when a prohibited act is committed. Consequently, a determination of the scope of the Equity in Higher Education Act requires an examination of the acts that are prohibited by the substantive provisions of the statute. Those prohibitions are contained in Education Code section 66270, which makes unlawful "discrimination on the basis of disability, gender, gender identity, gender expression, nationality, race or ethnicity, religion, sexual orientation, or any characteristic listed or defined in Section 11135 of the Government Code or any other characteristic

that is contained in the prohibition of hate crimes set forth in subdivision (a) of Section 422.6 of the Penal Code." Adopting the plain meaning of the words used, we interpret the statute to prohibit discrimination based on the factors listed. If the Legislature had intended the act to have a broader application, it would not have gone to the trouble of providing a specific list of prohibited types of discrimination or it would have used language demonstrating the list was not exclusive.

Applying this statutory interpretation to the allegations set forth in the second cause of action leads to the conclusion that it fails to allege facts sufficient to constitute a cause of action under the Equity in Higher Education Act. Based on a liberal reading of Vang's pleading, he alleged defendants discriminated against him because (1) he associated with impact geologists and (2) he was not an outstanding student, or at least defendants did not perceive him to be such a student. Neither of these types of discrimination are based on factors listed in Education Code section 66270. Therefore, the types of discrimination alleged by Vang fail to state a violation of the Equity in Higher Education Act. In other words, a statutory violation is not alleged by stating the discrimination was arbitrary. Furthermore, a statutory violation is not alleged by stating the discrimination was based on his association with impact geologists or the University official's perception of him as a student who was not outstanding. Accordingly, the trial court correctly sustained the demurrer to Vang's second cause of action.

IV. GOVERNMENT CODE SECTIONS 11135 THROUGH 11139.8

A. Statutory Text

Vang's third cause of action attempted to state a violation of Government Code sections 11135 through 11139.8. The article in the Government Code containing sections 11135, 11136, 11137, 11139 and 11139.8 addresses discrimination by state agencies. Government Code section 11135 applies to the California State University and its subdivision (a) states:

17.

"No person in the State of California shall, on the basis of sex, race, color, religion, ancestry, national origin, ethnic group identification, age, mental disability, physical disability, medical condition, genetic information, marital status, or sexual orientation, be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is conducted, operated, or administered by the state or by any state agency, is funded directly by the state, or receives any financial assistance from the state."

Government Code section 11136 addresses the enforcement of this anti-discrimination provision by stating that "[w]henever a state agency that administers a program … funded directly by the state … has reasonable cause to believe that a … local agency has violated the provisions of Section 11135 [or certain other statutes], the head of the state agency, or his or her designee, shall notify the … local agency of such violation and shall submit a complaint detailing the alleged violations to the Department of Fair Employment and Housing for investigation and determination pursuant to Article 1 (commencing with Section 12960) of Chapter 7 of this code." (Gov. Code, § 11136.) In addition, Government Code, section 11137 states that "[i]f it is determined that a … local agency has violated the provisions of this article, pursuant to the process described in Section 11136, the state agency that administers the program … involved shall take action to curtail state funding in whole or in part to such … local agency."

Government Code section 11139 clarifies the remedies available by stating that "[t]he prohibitions and sanctions imposed by this article are in addition to any other prohibitions and sanctions imposed by law." It also states that "[t]his article and regulations adopted pursuant to this article may be enforced by a civil action for equitable relief, which shall be independent of any other rights and remedies." (*Ibid.*) The term "equitable relief" includes injunctive relief and excludes money damages. (*Donovan v. Poway Unified School Dist.* (2008) 167 Cal.App.4th 567, 594–595.) Thus, on the threshold question of whether the Legislature intended to create a private right of action, Government Code section 11139 demonstrates a clear legislative intent to allow private

18.

enforcement of the statute and to limit the private remedies to injunctive relief. (*Donovan, supra,* at p. 595.)

   B.   Analysis of the Sufficiency of Vang's Allegations

The trial court determined Vang's claim of discrimination was not based on any of the protected characteristics set forth in the statute and, therefore, he failed to allege a violation of Government Code section 11135.  Vang contends violations of Government Code section 11135 occurred because he was "unlawfully denied full and equal access to the benefits of [a] program … administered by [the University]" and he also was "unlawfully subjected to discrimination" in a program administered by the University. (Gov. Code, § 11135.)

Not all *denials of access* to the benefits of a graduate program are unlawful for purposes of Government Code section 11135.  Similarly, not every type of alleged *discrimination* is unlawful for purposes of Government Code section 11135.  The types of denials of access and discrimination made unlawful by Government Code section 11135 are identified by the phrase "on the basis of" and the list of personal characteristics set forth after that phrase.  Identifying oneself as an impact geologist and associating with impact geologists are not among the characteristics listed in the statute.  Furthermore, the statute does not expressly make it unlawful to distinguish between students who are outstanding (or perceived to be outstanding) and those that are not.

The plain meaning of the words used in Government Code section 11135 do not reach the denial of access and discrimination alleged by Vang.  (*Hughes v. Board of Architectural Examiners* (1998) 17 Cal.4th 763, 775 [courts usually adopt the plain meaning of statutory language].)  Our inquiry does not end at the statute's plain meaning because in certain situations statutory language is not given its literal or plain meaning. For instance, a statute is not to be given its plain meaning if doing so would result in absurd consequences.  (*Horwich v. Superior Court* (1999) 21 Cal.4th 272, 276.)  The

19.

rationale for this rule of statutory construction is that the Legislature did not intend to create absurdities. (*Ibid*.) In this case, Vang has not demonstrated that the plain meaning of the statute produces absurd consequences. Therefore, we adopt the plain meaning of Government Code section 11135 and conclude the discrimination and denial of access alleged by Vang do not violate that statute. Accordingly, Vang's third cause of action fails to state a cause of action.

## V.     UNRUH CIVIL RIGHTS ACT

### A.     Legal Principles

Vang's fourth cause of action alleged a violation of the Unruh Act. The Legislature enacted the Unruh Act in 1959 to secure equal access to public accommodations and prohibit discrimination by business establishments. (*Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1150 (*Harris*).) The Unruh Act provides that "[a]ll persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." (Civ. Code, § 51, subd. (b).) The breadth of this provision is limited by the next subdivision, which states: "This section shall not be construed to confer any right or privilege on a person that is conditioned or limited by law or that is applicable alike to persons of every sex, color, race, religion, ancestry, national origin, disability, medical condition, marital status, sexual orientation, citizenship, primary language, or immigration status, or to persons regardless of their genetic information." (Civ. Code, § 51, subd. (c).)

The Unruh Act's fundamental purpose is "to secure to all persons equal access to public accommodations 'no matter' " their personal characteristics. (*Harris*, *supra*, 52

Cal.3d at p. 1169.)  It seeks to accomplish this purpose by prohibiting "arbitrary discrimination by business establishments."  (*In re Cox* (1970) 3 Cal.3d 205, 216.)  The particular kinds of discrimination identified in the Unruh Act's text are regarded by California courts as illustrative and the proscription against arbitrary discrimination extends beyond these enumerated classes.  (*Id*. at p. 212.)  Nonetheless, the listed factors bear the common element of being personal characteristics of an individual and, therefore, the Unruh Act is construed to confine its reach to forms of discrimination similar to the statutory characteristics—such as a person's physical attributes, personal beliefs or geographical origin.  (*Candelore v. Tinder, Inc.* (2018) 19 Cal.App.5th 1138, 1145.)  Consequently, California courts recognize that the Unruh Act does not prohibit *all* discrimination.  (*Ibid*.)  For example, business establishments may treat people differently based on their "financial status or capability."  (*Harris*, *supra*, at p. 1161.)

In *Koebke v. Bernardo Heights Country Club* (2005) 36 Cal.4th 824 (*Koebke*), the Supreme Court noted *Harris* did not define the phrase "personal characteristic." (*Koebke, supra,* at p. 842.)  Instead, the court "indicated that, at minimum, it encompassed both the categories enumerated in the [Unruh] Act and those categories added to the [Unruh] Act by judicial construction."  (*Ibid*.)  The protected categories "represent traits, conditions, decisions, or choices fundamental to a person's identity, beliefs and self-definition."  (*Id.* at pp. 842–843.)

Broadly stated, the issue presented is whether one or both of the traits alleged by Vang are protected from discrimination by the University.  Under the multiple prong approach adopted by our Supreme Court, this issue can be restated as whether Vang's "claim of discrimination under the [Unruh] Act is based on a classification that involves personal characteristics."  (*Koebke*, *supra*, 36 Cal.4th at p. 841.)  There are three ways a personal characteristic may be protected by the Unruh Act.  First, it may be explicitly listed in the statutory text.  Second, it may have been "added to the [Unruh] Act by judicial construction."  (*Koebke*, *supra*, at p. 842.)  Third, if not previously identified by

21.

statute or judicial decisions, a court might construe the statute to reach the new characteristic and add that characteristic to those already recognized.

B.     Application of Principles

First, the text of the Unruh Act does not list impact geologists or students who are not perceived to be outstanding as being "entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." (Civ. Code, § 51, subd. (b).)  Second, the parties have not cited, and we have not located, any judicial decision adding impact geologists or students who are not perceived to be outstanding to the personal characteristics list explicitly set forth in the Unruh Act.

Consequently, the question comes down to whether this court, as a matter of statutory construction, should add one or both of those traits to the list of personal characteristics protected by the Unruh Act.  We conclude neither trait should be protected by the Unruh Act.

First, whether a student is, or is perceived to be, outstanding, provides a university with a legitimate business reason for providing different treatment to students.  We agree with the trial court that the University "has significant pedagogical, academic and reputational interests which are served by differentiating between students seeking degrees based on their academic accomplishments and (for masters students) peer-reviewed research topics."  Consequently, we will not construe the Unruh Act as requiring universities to provide equal advantages and services to all master's students by allowing each student to select his or her own research thesis topic.

Second, universities have a legitimate business reason for treating a student differently for being an impact geologist and associating with impact geologists.  If the Unruh Act made such a distinction unlawful, every campus of the California State University and the University of California would be required to allow graduate students

22.

to pursue thesis topics relating to impact geology regardless of whether the faculty at that campus had any interest or expertise in the area. Such a requirement would undermine the quality of the graduate program, including the quality of instruction and guidance received by the graduate student. Therefore, University had legitimate reasons for discriminating against Vang based on his status as an impact geologist or his association with impact geologists and the consequences to deeming such discrimination unlawful would harm rather than improve higher education in California.

Based on the foregoing, we conclude the type of discrimination alleged by Vang is not arbitrary or unlawful for purposes of the Unruh Act. Thus, the trial court properly sustained the demurrer to Vang's fourth cause of action.

VI.     POLITICAL REFORM ACT

A.     Allegations

Vang's fifth cause of action alleged a violation of the Political Reform Act of 1974, Government Code sections 81000 through 91014. Vang alleged defendant Nef, the vice provost, was paid with state monies and must be loyal to his employer, the University. Vang alleged Nef participated in making a decision on Vang's EO-1063 complaint, Nef had an economic interest in that decision, and, thus, Nef had a conflict of interest.

Vang alleged Nef had at least two identifiable economic interests for purposes of the Political Reform Act because (1) Nef held the position of vice provost at the University and (2) his source of earned income came from the University. Vang alleged Nef "will not openly admit any wrongdoing that will put his superiors in a vulnerable position in a potential lawsuit, because a loss in the university's finances may mean a cut to his income." In addition, Vang alleged Nef's promotional possibilities to the position of provost and vice president were implicated by his decision on the EO-1063 complaint

23.

and "[t]hat promotion may not be possible if he places his superiors in a legally indefensible position.  (e.g. quid pro quo)."

Reiterating these points, Vang alleged "Nef's executive decision [regarding the EO-1063 complaint] has a material financial effect on his economic interests" and "[i]t is reasonably foreseeable that … Nef's economic interest is materially affected."  Vang alleged Nef knew his participation in the decision was a violation of the Political Reform Act and, to comply with the act, Nef should have recused himself.

B.    Overview

1.    *Statutory Provisions*

Chapter 7 of the Political Reform Act addresses conflicts of interest by public officials.  This chapter contains Government Code section 87100, which states:  "No public official at any level of state or local government shall make, participate in making or in any way attempt to use his official position to influence a governmental decision in which he knows or has reason to know he has a financial interest."

Government Code section 87103 provides in relevant part:  "A public official has a financial interest in a decision within the meaning of Section 87100 if it is reasonably foreseeable that the decision will have a material financial effect, distinguishable from its effect on the public generally, on the official [or] a member of his or her immediate family ...."  The Political Reform Act does not define the term "reasonably foreseeable." In *Smith v. Superior Court* (1994) 31 Cal.App.4th 205, the court determined an event is "reasonably foreseeable" if there is a substantial likelihood it will occur.  (*Id*. at p. 212.) This definition does not require certainty and it does not encompass a mere possibility. (*Ibid*.)

2.    *Regulations*

Regulations have been promulgated to help explain the application of the conflict of interest provisions in the Political Reform Act.  (See Cal. Code Regs., tit. 2, §§ 18700–

24.

18760 (Regulations).)[4]  For instance, the steps undertaken to determine whether a public official has a prohibited conflict of interest are set forth in subdivision (d) of Regulation 18700, which provides in relevant part:

> "(1) Step One:  Is it reasonably foreseeable that the governmental decision will have a financial effect on any of the public official's financial interests?  To determine if the financial effect is reasonably foreseeable, apply Regulation 18701.  If the answer is no, there is no conflict of interest under the Act.  If the answer is yes, proceed to Step Two.

> "(2) Step Two:  Will the reasonably foreseeable financial effect be material?  To determine if the reasonably foreseeable financial effect is material, apply Regulation 18702.  If the answer is no, there is no conflict of interest under the Act. If the answer is yes, proceed to Step Three."

Regulation 18701, subdivision (b) sets forth the general principle that where "the financial effect can be recognized as a realistic possibility and more than hypothetical or theoretical, it is reasonably foreseeable."  In contrast, "[i]f the financial result cannot be expected absent extraordinary circumstances not subject to the public official's control, it is not reasonably foreseeable." (*Ibid*.)  The Regulation also provides a nonexclusive list of factors to consider in determining whether a financial effect is reasonably foreseeable:

> "(1) The extent to which the occurrence of the financial effect is contingent upon intervening events, not including future governmental decisions by the official's agency, or any other agency appointed by or subject to the budgetary control of the official's agency.

> "(2) Whether the public official should anticipate a financial effect on his or her financial interest as a potential outcome under normal circumstances when using appropriate due diligence and care.

> "(3) Whether the public official has a financial interest that is of the type that would typically be affected by the terms of the governmental decision or whether the governmental decision is of the type that would be expected to have a financial effect on businesses and individuals similarly situated to

---

[4]     The parties' appellate briefing does not mention the existence of the Regulations and, consequently, does not analyze their application to the facts alleged in the SAC.

25.

those businesses and individuals in which the public official has a financial interest.

"(4) Whether a reasonable inference can be made that the financial effects of the governmental decision on the public official's financial interest might compromise a public official's ability to act in a manner consistent with his or her duty to act in the best interests of the public.

"(5) Whether the governmental decision will provide or deny an opportunity, or create an advantage or disadvantage for one of the official's financial interests, including whether the financial interest may be entitled to compete or be eligible for a benefit resulting from the decision.

"(6) Whether the public official has the type of financial interest that would cause a similarly situated person to weigh the advantages and disadvantages of the governmental decision on his or her financial interest in formulating a position."  (Regulation 18701, subd. (b).)

Of particular significance in this appeal is the guidance the Regulations provide as to the meaning of the phrase "material financial effect" that appears in Government Code section 87103.  The financial interests identified in Vang's allegations involve Nef's personal finances—specifically, his interests in avoiding a decrease in his compensation as vice provost and the prospect for an increase in compensation due to a promotion. Regulation 18702.5, subdivision (b) states that "a personal financial effect is not material if the decision would:  [¶] … [a]ffect only *the salary*, per diem, or reimbursement for expenses the public official … receives from a … government agency .…"  (Italics added.)

Based on Regulation 18702.5, subdivision (b), we need not decide whether Nef's decision on the EO-1063 complaint had a *reasonably foreseeable effect* on Nef's financial interest in his personal finances.  The Regulation establishes that the alleged personal financial effect would not be "material" for purposes of the Political Reform Act.  Consequently, the answer to step two of the conflict of interest analysis is "No." (See Regulation 18700, subd. (d)(2).)  This answer establishes that "there is no conflict of interest under the [Political Reform] Act."  (*Ibid*.)

26.

Consequently, Vang's theory about a conflict of interest does not set forth a violation of the Political Reform Act. Therefore, the trial court properly sustained the demurrer to the Vang's fifth cause of action.

## VII.  BREACH OF CONTRACT

### A.  Allegations

Vang's sixth cause of action alleged defendants breached an implied contract. The content or terms of the contract are identified in Vang's allegation that implied contracts are formed between the University and student because the University's publications and advertisements are an invitation to enter a contract and an implied contract is created when a student accepts the University's offer of enrollment. Vang also alleged the University formed a contract with him to uphold statutory law and cited the statutes addressed in parts II through VI of this opinion. Thus, Vang argues the contractual terms included both University's publications and the statutes identified in the SAC. One of the publications cited by Vang is the University's policy on disruptive classroom behavior. A paragraph labeled "ACADEMIC FREEDOM" states: "Students and faculty must be free to pursue truth as well as personal and intellectual development. A necessary condition of such pursuit is an acceptance of the spirit of inquiry and an appreciation for diverse ideas, viewpoints, cultures, and life-styles. This condition must exist in both the classroom and the overall campus environment." Vang interprets this policy as a promise of full freedom of inquiry.

As to the "breach" element of his contract claim, Vang contends defendants "breached their contract with [him] by opposing his full freedom of inquiry at [the University]." Paragraph 233 of the SAC alleged defendants "broke their promises by discrimination, by not providing educational equality, accommodation, equity, and quality, by preventing [Vang] from addressing issues that are central to his full

27.

development as a responsible citizen, and by handling decision-making issues in which they have conflict[s] of interest."

B.     Trial Court's Decision

The trial court considered Vang's breach of contract cause of action and sustained the special demurrer for uncertainty and the general demurrer for failure to state a cause of action. The court concluded California law required the claim submitted under Government Claims Act to fairly reflect the factual basis for recovery and applied this standard to determine Vang's claim did not assert any breach of contract claim. Thus, the court concluded the contract claim was vulnerable to demurrer.

Relying on *Kashmiri v. Regents of University of California* (2007) 156 Cal.App.4th 809, the trial court also concluded Vang failed to allege a statement by the University that was sufficiently definite and specific to qualify as a term in a contract. In *Kashmiri*, the First District stated: "Universities frequently publish numerous catalogues and bulletins, but not all statements in these publications amount to contractual obligations." (*Id*. at p. 829.) On the question of which statements might create a contractual obligation and which statements do not, the First District stated that "courts have not interpreted general and vague declarations or promises in university publications as creating contractual obligations." (*Id*. at p. 832.)

The trial court also addressed Vang's theory that the contract included the University's promise to follow all statutory laws. The court determined Vang had failed to state a claim for any violation or breach of any mandatory statutory duty and, therefore, he also failed to state a contractual claim based on a statutory violation.

C.     Basic Principles

*1.     Contract Formation and Breach*

A plaintiff must plead and prove the following elements to establish a cause of action for breach of contract: (1) the existence of the contract, (2) the plaintiff's

28.

performance or excuse for nonperformance, (3) the defendant's breach of a contract term, and (4) resulting damages to the plaintiff.  (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821; see CACI No. 303 [breach of contract—essential elements].)  In turn, the first element—the existence of a contract—requires: "1. Parties capable of contracting; [¶] 2. Their consent; [¶] 3. A lawful object; and, [¶] 4. A sufficient cause or consideration."  (Civ. Code, § 1550; see CACI No. 302 [contract formation].)  "The consent of the parties to a contract must be: [¶] 1. Free; [¶] 2. Mutual; and, [¶] 3. Communicated by each to the other."  (Civ. Code, § 1565.)  "Consent can be communicated with effect, only by some act or omission of the party contracting, by which he intends to communicate it, or which necessarily tends to such communication."  (Civ. Code, § 1581.)  The manifestation of mutual consent often is achieved through the process of an offer being made and then accepted.  (*Alexander v. Codemasters Group Limited* (2002) 104 Cal.App.4th 129, 141 (*Alexander*); see CACI Nos. 307–311 [offer and acceptance].)

An aspect of mutual consent involves the clarity of the terms of the agreement made.  "To form a contract, an 'offer must be sufficiently definite … that the performance promised is reasonably certain.' "  (*Alexander*, *supra*, 104 Cal.App.4th at p. 141.)  The terms of a contract must be "reasonably certain" so those terms provide a basis for determining whether a breach occurred and for giving an appropriate remedy.  (*Ibid*.)  Thus, when a court determines a contract term is too indefinite to be enforceable, it means the parties did not form an agreement on the matter addressed by that term.  (*Id*. at p. 142.)  The certainty requirement underlies the principle stated in *Kashmiri* that "courts have not interpreted general and vague declarations or promises in university publications as creating contractual obligations."  (*Kashmiri*, *supra*, 156 Cal.App.4th at p. 832.)

### 2. Claims Against a Public Entity

In *Stockett v. Association of California Water Agencies Joint Powers Ins. Authority* (2004) 34 Cal.4th 441 (*Stockett*), the California Supreme Court stated the principles that, after a claim under the Government Claims Act is rejected and the plaintiff "files a complaint against the public entity, the facts underlying each cause of action in the complaint must have been fairly reflected in a timely claim." (*Id.* at p. 447.) In other words, a cause of action in a complaint is subject to demurrer if it alleges a factual basis for recovery that is not fairly reflected in the written claim. (*Ibid.*)

### D. Application of Principles

### 1. Scope of Vang's Claim Document

Vang argues the trial court erred in concluding that the 43-page claim he submitted under the Government Claims Act did not assert a breach of contract claim. Vang states the claim used the word "contract" five times and refers to the claim's quotation of provisions in Civil Code section 51.7 that used the word "contract" twice.[5] Based on these references to the term "contract," Vang contends "the breach of contract was not 'wholly absent' in the government claims, but spoken for through the statutes used." Our review showed that Vang's claim document alleged statutory violations. Therefore, to the extent Vang's breach of contract cause of action is based on violations of those statutes, that basis was "fairly reflected" in the claim document. (See *Stockett*, *supra*, 34 Cal.4th at p. 447.)

The next question is whether any of the statutory violations alleged in the claim document constitute a breach of the terms of a contract between Vang and the University. We assume without deciding that the terms of the statute are incorporated into the alleged contract between Vang and the University. As a result, we consider whether the allegations identify a "breach" of those terms. Like the trial court, we have concluded

---

[5] Civil Code section 51.7 "shall be known, and may be cited, as the Ralph Civil Rights Act of 1976." (Civ. Code, § 51.7, subd. (a).)

Vang's allegations do not state a violation of the statutes. It follows that he has failed to adequately allege the contract was breached as a result of statutory violations.

2.     *Certainty Requirement*

Vang contends the contract he entered with the University includes a term that promised him full freedom of inquiry at the University. He alleged defendants breached that term by opposing his full freedom of inquiry. Under the principles of contract law requiring certainty, as specifically applied to universities, we conclude the promise of full freedom of inquiry is too indefinite to be enforceable under the facts alleged in Vang's SAC. In other words, it is uncertain whether such a promise included the right to choose a master's thesis research topic and precluded the University from rejecting the choice made by Vang. For example, it is possible to interpret the freedom of inquiry as having been satisfied in the case because Vang (1) was allowed to do his field research and review authorities on the subject of impact geology, (2) was allowed to work up the results of his field and academic research, and (3) was allowed to inquire of the faculty whether any member would act as his advisor. Stated from another perspective, it is unclear whether a promise of freedom of inquiry includes the more specific promise of allowing a master's student to *complete* a thesis project on a topic chosen by the student. As a result, under the principle that the reasonableness of the student's expectation as to the contractual obligations undertaken by a college or university are "measured by the definiteness, specificity, or explicit nature of the representation at issue" (*Kashmiri*, *supra*, 156 Cal.App.4th at p. 832), we conclude any promise of full freedom of inquiry is too indefinite to constitute an enforceable contractual term in the particular circumstances of this case.

We also conclude the requisite certainty does not exist as the allegations that the University breached its promises (1) not to discriminate, (2) to provide educational equality, accommodation, equity and quality, and (3) to allow Vang to address issues

31.

central to his full development as a responsible citizen. These breaches were alleged in paragraph 233 of the SAC. Such promises, in the university setting, are too general to create a reasonable expectation that a graduate would be allowed to choose his or her own thesis topic. (*Kashmiri*, *supra*, 156 Cal.App.4th at p. 832.)

In summary, we conclude Vang failed to allege the breach of an enforceable contractual obligation. As a result, the trial court properly sustained the demurrer to Vang's sixth cause of action.

## VIII. ACTUAL FRAUD AND DECEIT

### A. Background

The elements of a cause of action for fraud or deceit are (1) misrepresentation, (2) knowledge of the falsity or scienter, (3) intent to defraud—that is, induce reliance, (4) justifiable reliance, and (5) resulting damages. (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638; see *Mirkin v. Wasserman* (1993) 5 Cal.4th 1082, 1092 [plaintiff in action for deceit must plead common law element of actual reliance]; cf. Civ. Code, § 1572 [actual fraud] with Civ. Code, § 1710 [deceit defined].) These elements "must be pled specifically; general and conclusory allegations do not suffice." (*Lazar*, *supra*, at p. 645.) The requirement for specific allegations " 'necessitates pleading *facts* which "show how, when, where, to whom, and by what means the representations were tendered." ' " (*Ibid*.; see *Glaski v. Bank of America* (2013) 218 Cal.App.4th 1079, 1091 [plaintiff's conclusory allegation of reliance was insufficient under rules that require fraud to be pled specifically].)

### B. False Statement of Material Fact

Vang's seventh cause of action is labeled actual fraud and intentional deceit. Vang contends the trial court erred in concluding he failed to adequately allege a statement of material fact which defendants knew to be false. Vang refers to paragraph 251 of the SAC, which alleged defendants promised to "provide an environment in which

research and professional activity are valued and supported, a free and open scholarly inquiry for the exploration and appreciation of diverse ideas and viewpoints, be responsive to the needs of citizens of this state, and show respect for and due consideration of the role and contributions that each member of the university community, including the student, makes toward the mission of the university." Vang also alleged the University's conflict of interest handbook includes the promise not to make decisions where the University employee has a conflict of interest. Vang alleged that, contrary to these promises, "in a correspondence letter dated February 29, 2016, Defendants stated that [Vang] is not free to choose a thesis research … and, that [he] would be removed if he did not choose a thesis research within the existing fields of the [EES] Department."

C.     Analysis

First, we conclude that Vang has failed to allege sufficient facts to show that he was made a false promise that decisions about his participation in the graduate program would be made by University employees who did not have a conflict of interest. As discussed earlier, Nef did not have a material financial interest in the decisions made about Vang's thesis topic and his participation in the graduate program. Because no conflict of interest existed, a fraud cannot be alleged on the ground defendants broke their promise not to participate in a decision in which they had a conflict of interest.

Second, the promise to provide free and open scholarly inquiry and to provide an environment that supports and values research and professional activity were not shown to have been false by the University's statement that Vang was not free to choose a thesis research topic. Moreover, as discussed in the analysis of Vang's breach of contract claim, such statement did not create a reasonable expectation that Vang would be allowed to choose his own thesis research topic. Rephrasing this determination in the language used to specify the elements of fraud, Vang is unable to allege that he reasonably relied

33.

on the general statements made in University publications as a representation that he would be allowed to choose his own research topic.

IX.     OTHER ISSUES

    A.     <u>Appellate Procedure</u>

Defendants contend that Vang's failure to properly cite the appellate record in his opening brief constitutes a forfeiture or waiver of his arguments and, therefore, this court should disregard those arguments.  (Cal. Rules of Court, rule 8.204(a)(1)(C).)  Based on our conclusions that Vang has failed to allege facts sufficient to state a cause of action, we need not reach this issue.

Defendants also contend the appeal should be denied because the appellant's appendix is inadequate.  For instance, defendants argue the failure to include their demurrer to the SAC violates the provision stating an appellant's appendix must contain "any item that the appellant should reasonably assume the respondent will rely on."  (Cal. Rules of Court, rule 8.124(b)(1)(B).)  We do not reach this issue.

    B.     <u>Leave to Amend</u>

When a pleading omits an essential allegation, the next step of a trial or appellate court's analysis addresses "whether there is a reasonable possibility that the defect can be cured by amendment."  (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)  Generally, the plaintiff has the burden of demonstrating a reasonable possibility that the defect can be cured by amendment.  (*Ibid*.)  Here, Vang has not carried this burden of demonstrating he could cure any of the defects in his causes of action.  Instead, he argued he "did not bring this case regarding [defendants'] discretionary action, but under causes of action regarding violating his full freedom of inquiry that is protected by state law/Constitution."  He states that if this court determines additional elements are necessary for the SAC to be complete, he requests leave to amend.  This general request

34.

does not carry his burden of demonstrating a reasonable probability that a particular defect could be cured if he were granted leave to amend.

## DISPOSITION

The judgment is affirmed.  Respondents shall recover their costs on appeal.


FRANSON, Acting P.J.

WE CONCUR:


SNAUFFER, J.


DESANTOS, J.